Arthur B. JESSIE *v.* Betty J. JESSIE

920 S.W.2d 874

Court of Appeals of Arkansas
Division III
Opinion delivered May 8, 1996

*Burbank, Dodson & McDonald*, by: *Gary D. McDonald*, for appellant.

*Vickery, Landers & Lightfoot, P.L.L.C.*, by: *Ian W. Vickery*, for appellee.

JOHN E. JENNINGS, Chief Judge. Arthur B. Jessie appeals from a divorce decree of the Union County Chancery Court. He argues that the trial court erred in failing to dismiss the complaint for lack of personal jurisdiction over him. He also argues that the trial court lacked subject-matter jurisdiction because his marriage to appellee,

Betty Jessie, was void and invalid. We disagree and affirm.

The parties were married in El Dorado, Arkansas, in July 1960. They then moved to Texas. A son, Jeff, was born there in 1961. The family, including her son from a previous marriage, moved frequently in the ensuing years, with her and the boys living at various times in Texas, Kansas, Oklahoma, and Arkansas while appellant worked in those states and in Louisiana, sometimes living with the family and sometimes living at the job site. After a serious illness, Jeff required special care. In 1969 they decided it would be best for Jeff to attend a special school in El Dorado, and the family set up its household there. After a year and a half, the family moved to another house in El Dorado which they rented for two years and then bought. Appellant testified that after the family relocated to El Dorado in 1969, he continued to live and work in Texas and never lived in Arkansas. He testified that he "maintained two households for thirty years" and provided support for his wife and son, visiting them regularly once a month or every six weeks. Appellee testified that appellant would "come in once a week or every two weeks" and she would do his laundry and prepare meals for him to freeze and take back with him.

Jeff died in 1993. In 1994 appellee filed for divorce in Union County, Arkansas. Appellant entered a special appearance and filed a motion to dismiss on the ground that the court lacked personal jurisdiction. He also argued that appellee had failed to obtain a divorce from her prior husband, William Kelly, before marrying appellant and that therefore the parties' marriage was void. Appellant participated with counsel at a hearing on the motion to dismiss, but did not participate in the hearing regarding the divorce and division of marital property.

The chancellor found that appellant was personally subject to the court's jurisdiction "as a result of his activities in Arkansas, including ownership of real and personal property in the State of Arkansas, his support of members of his family in the State of Arkansas for an extended period of time and the physical presence of [appellant] within the State on a regular and frequent basis since 1969 until the death of his son in 1993."

Appellant argues that he is a nonresident of Arkansas and has been for many years, and that when appellee established her present domicile in Union County in 1969, he maintained and continued

his established domicile in Texas, where he has continued to reside. He argues that the parties' last marital domicile was outside of Arkansas, and that he has committed no "acts" in the state sufficient to confer jurisdiction under the long-arm statute.

■■ The question of whether the trial court's determination of personal jurisdiction over appellant was clearly erroneous must be answered in two parts. First is whether the long-arm statute providing for service of process on nonresidents was complied with. Appellant acknowledges that he was served pursuant to the statute. Our statute, codified at Ark. Code Ann. § 16-58-120 (1987), has been read by the supreme court to provide that any cause of action arising out of acts done by an individual in Arkansas, including matters concerning domestic relations, may be brought here although the defendant has left the state. *Bunker* v. *Bunker*, 261 Ark. 851, 552 S.W.2d 641 (1977). Whether the exercise of jurisdiction on the basis of acts done in this state is reasonable depends upon the facts of each individual case, with the principal factors to be considered being the nature and quality of the acts, the extent of the relationship of the defendant to this state, and the degree of inconvenience which would result to the defendant by being forced to stand suit in this state in that particular cause of action. *Cotton* v. *Cotton*, 3 Ark. App. 158, 623 S.W.2d 540 (1981).

■ If state law provides for personal jurisdiction, the next question to be answered is whether the exercise of that jurisdiction comports with federal constitutional requirements of the Due Process Clause of the Fourteenth Amendment. *See Kulko* v. *California Superior Court*, 436 U.S. 84 (1978). The constitutional standard for determining whether a state may enter a binding judgment against a non-resident defendant, set forth in *International Shoe Co.* v. *Washington*, 326 U.S. 310 (1945), requires that a defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. An essential criterion in all cases is whether the quality and nature of the defendant's activity is such that it is reasonable and fair to require him to conduct his defense in that state. This "minimum contacts" test is not susceptible of mechanical application; a determination of "reasonableness" requires that the facts of each case be weighed to determine whether the requisite "affiliating circumstances" are present. *See generally, Kulko, supra.*

■ There can be no question that appellant in this case had

substantial and regular contacts with the State of Arkansas. He owned real property here. He maintained a car registered in his own name here. He had a checking account here, supported his family here, and maintained his family's home here. He made regular frequent visits to the family home where he would sometimes stay for several days and nights while his wife did his laundry and prepared two weeks' worth of meals for him to take back to his trailer and job in Texas. Unlike the "appellant's glancing presence" in the forum state in *Kulko*, appellant here "purposefully derive[d] benefits" from his activities in Arkansas, and we cannot conclude that the chancery court's exercise of jurisdiction over him offends "traditional notions of fair play and substantial justice."

Appellant also argues that the chancellor should have granted his motion to dismiss on the ground that there was no showing that a divorce decree was ever entered terminating appellee's prior marriage to William Kelly, thus rendering the parties' marriage void. The chancellor, in a temporary order, noted that at the hearing on the appellant's motion, "no proof was submitted by [appellant] as to the invalidity of the marriage." In the divorce decree, the chancellor found that appellee was married to William Kelly on November 26, 1958, filed an action for divorce on March 7, 1960, and that "no divorce therein was granted." The decree further stated:

> With regard to the challenge of subject matter jurisdiction of this Court, the Court finds that notwithstanding that the marriage of the parties was technically invalid as a result of the failure of the [appellee] to receive a final divorce from her previous husband, that if the invalidity of the marriage was to be asserted as a defense, such a defense would work an inequitable result and constitute a miscarriage of justice. Accordingly, by the conduct and actions of the [appellant], [appellant] is estopped from asserting such a defense, and the Court finds that it does have subject matter jurisdiction over the marriage and the dissolution of the marriage between the parties hereto. Such finding is based upon the extended duration of the marital relationship between the parties hereto for thirty-four (34) years, during which each party believed themselves to be legally and morally bound by matrimony one to the other, including the raising of a child together, the establishment of a home for [appellee] and Jeff Jessie, and the discharge of obligations and duties of a spouse

as each party respectively understood those obligations.

Appellant argues that while the principle of estoppel would apply to prevent appellee from challenging the validity of the parties' marriage, it should not apply to him.

Appellant testified that he first learned that there might have been a question regarding appellee's prior marriage after she filed for divorce in 1994, when a search of the court records failed to produce a decree of divorce. Introduced into evidence were a verified complaint for divorce filed by appellee against William Kelly, along with a warning order, proof of publication and affidavit, and a copy of the chancery court docket. Appellee testified that she had engaged an attorney to help her obtain a divorce from Mr. Kelly, and the lawyer had indicated to her that he would take care of it and that she would not have to come to court. She testified that it was her understanding that "it had gone through" and that she had custody of her son born of that marriage. She testified that the first indication she had that perhaps the divorce hadn't been made final was in 1994. She testified that Mr. Kelly deserted her when their son was three weeks old, that she never saw or heard from him again, had no idea as to his whereabouts, and filed for divorce some eighteen months later.

It has been held that, while a legal marriage cannot be created by estoppel, equity can require that parties be estopped from denying the validity of a marriage. *Brown v. Imboden*, 28 Ark. App. 127, 771 S.W.2d 312 (1989). While it is true that a bigamous marriage is void from its inception,

> [I]t is a longstanding presumption of law that a marriage entered in due form is valid, and the burden of proving a marriage is invalid is upon the party attacking its validity. It is presumed that, when a man and woman are married, and one had a living spouse, the former spouse has been divorced at the time of the marriage.
>
> Further, there is the additional presumption that the former spouse was dead at the time of the second marriage. The presumptions of divorce from or death of a previous spouse are so strong that they exist despite the fact that overcoming them involves proof of a negative, i.e., proof of no divorce and/or proof that the previous spouse is still living.

*Clark* v. *Clark*, 19 Ark. App. 280, 719 S.W.2d 712 (1986) (citations omitted). It has been held that even if the existence of the former spouse at the time of the second marriage was established by proof, and the clerk of the divorce court in the county of the purported divorce testified that careful examination of the records failed to produce any record of a divorce obtained in the prior marriage, such proof is not sufficient to overturn the second marriage, which is presumed to be legal. *Estes* v. *Merrill*, 121 Ark. 361, 181 S.W. 136 (1915). Applying these longstanding principles to the facts before us, we cannot say that the chancellor's ruling was clearly erroneous.

Affirmed.

ROGERS and NEAL, JJ., agree.